FILED

2020 May-14  AM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARGARET HENDERSON,** | } | |
| | } | |
| **PLAINTIFF,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:17-cv-903-MHH** |
| | } | |
| **LABORATORY CORPORATION** | } | |
| **OF AMERICA HOLDINGS** | } | |
| | } | |
| **DEFENDANT.** | | |

## <u>MEMORANDUM OPINION</u>

This age discrimination case is before the Court on the defendant's motion for summary judgment.  Margaret Henderson contends that after her long career with Laboratory Corporation of America, the company discharged her when she was 65 because of her age.  Lab Corp asserts that it released Ms. Henderson from employment for poor managerial performance and violations of LabCorp policies. Because she has not presented direct evidence of age discrimination, to survive LabCorp's summary judgment motion, Ms. Henderson must identify circumstantial evidence from which reasonable jurors either may determine that LabCorp's proffered reason for Ms. Henderson's termination is pretext for age-based discrimination or may infer intentional age-based discrimination from a convincing mosaic of circumstantial evidence.

1

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). The Court does not weigh the evidence or make credibility determinations; those are jury functions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party cannot survive summary judgment by presenting "a mere scintilla of evidence" supporting her position and must instead present evidence from which a reasonable jury could find in her favor. *Brooks v. Cty Comm'n of Jefferson Cty*, 446 F.3d 1160, 1162 (11th Cir. 2006).

2

## **FACTUAL BACKGROUND**

LabCorp is a publicly-traded company that operates clinical laboratories throughout the country.  (Doc. 45-13, ¶ 3).  LabCorp is divided into geographic divisions, and each laboratory in each division is divided into departments.  (Doc. 45-13, ¶ 4).  LabCorp's Birmingham lab has 18 departments.

Ms. Henderson began working as a laboratory technician in LabCorp's Birmingham office in 1973.  (Doc. 45-7, p. 4, tpp. 9–10).  In 1989, Ms. Henderson was promoted to a management position.  (Doc. 45-7, p. 4, tp. 10).  By 2011, Ms. Henderson oversaw four departments in the Birmingham office – microbiology, serology, hematology, and cytology.  (Doc. 45-7, p. 6, tpp. 18–19).

In 2011, LabCorp tasked Rudy Menendez, Vice President of Laboratory Organizations, with restructuring the company's Southeastern Division.  (Doc. 45, ¶ 6).  As part of the restructuring, Mr. Menendez reduced Ms. Henderson's responsibilities.  (Doc. 45-7, pp. 4–5, tpp. 12–13).  Initially, Ms. Henderson maintained oversight of the microbiology and serology departments.  (Doc. 45-7, p. 5, tp. 13).  In 2012, Ms. Henderson's responsibilities were reduced again, leaving her with oversight of only the Birmingham microbiology department.  (Doc. 45-13, ¶ 6; Doc. 45-7, pp. 6–7, tpp. 20–21).

As the head of the microbiology department, Ms. Henderson reported to Lynn Metcalf, the Birmingham lab's general manager.   Ms. Metcalf reported to Mr. Menendez in Tampa.  (Doc. 45-9, p. 5, tp. 15).   Ms. Henderson was responsible for managing her department's laboratory supervisors and their team leaders to ensure that specimens were processed efficiently.  (Doc. 45-13, ¶ 10)

Mr. Menendez focused on performance metrics to assess staffing and productivity of the departments under his supervision.  (Doc. 45-13, ¶ 7).  He examined reports that measured each department's rate of completion of specimen testing, overall productivity rates, and use of overtime.   In 2014, LabCorp's microbiology department in Birmingham struggled to meet the metrics for the department.  (Doc. 45-9, p. 6, tp. 17).  Ms. Henderson acknowledged the difficulty and the high number of overtime hours in the microbiology department but attributed the data to inadequate staffing.  In emails to Ms. Metcalf, Ms. Henderson complained that technologists in her department were leaving LabCorp and not being replaced. (Doc. 45-10, pp. 1–10).

In November 2014, Ms. Metcalf gave Ms. Henderson a performance improvement plan – a PIP – that suggested ways to better manage the microbiology department.  (Doc. 45-8, p. 9). The PIP focused on the department's use of overtime. (Doc. 45-8, p. 9).  Ms. Metcalf stated that management expected that "micro[biology] resources [be] managed to maintain a less than 5% OT and still

4

perform between #3 and #6 in productivity." (Doc. 45-8, p. 9). In September of 2014, the department had ranked fifth in productivity with a 14.3% OT rate. (Doc. 45-8, p. 9). In the PIP, Ms. Metcalf indicated that OT rates for the microbiology department had been high regardless of the number of full-time employees in the department. (Doc. 45-8, p. 9). The PIP stated that "[e]xcessive OT is due to Miss-Management [sic] of resources. . . . [M]onitoring workflow and adjusting to workflow changes is one of the key elements to controlling OT. You must have personnel available when the work is available." (Doc. 45-8, p. 9).

In 2015, LabCorp's Birmingham and Tampa laboratories began receiving twice daily automated reports – AUDI reports – showing the number of overdue untested specimens in each department. (Doc. 45-13, p. 3, ¶ 8). The reports identified specimens that had not been tested or for which the test results had not been timely released according to standard operating procedures. (Doc. 45-13, p. 3, ¶¶ 8–9). A high AUDI rating indicated delayed test results, which could cause delayed diagnoses or spoiled specimens. (Doc. 45-13, ¶ 9). Generally speaking, Mr. Menendez expected each department to keep the AUDI below 200. (Doc. 45-3, p. 9, tpp. 31–32; Doc. 45-8, p. 8).

In June 2015, Ms. Metcalf evaluated Ms. Henderson's work. Ms. Metcalf scored Ms. Henderson 88 out of 100, meaning she "me[t] expectations." Ms. Henderson received "exceeds expectations" scores for Quality of Work,

Dependability, Initiative, and Communication.  Ms. Henderson received "meet expectations" ratings for Quantity of Work ("meets departmental goals, productivity standards, and deadlines while maintaining the expected quality") and Planning and Organizing.  Ms. Metcalf wrote that Ms. Henderson was "excellent in anticipating the needs of her department and planning ahead to meet those needs."  (Doc. 45-10, pp. 34–35).

During this time, supervisors from the Tampa office, including Ms. Henderson's counterpart in microbiology, Ethel Pujols, visited Birmingham to counsel and coach the microbiology department.  (Doc. 45-11, p. 10, tp. 36). Because the AUDI was developed in Tampa, the Tampa microbiology department had developed instruments and resources to increase the department's efficiency to meet the AUDI.  (Doc. 45-9, pp. 34–35, tpp. 126–131).  Ms. Henderson disliked these visits.  In August 2015, she emailed Ms. Metcalf:  "Ethel Pujols has been here at least 3 or 4 times in the past year and Dr. Harvey was here last August.  I feel like I am constantly being harassed and I feel like my job is in constant jeopardy." (Doc. 45-10, p. 10).  On October 5, 2015, Ms. Pujols emailed Ms. Henderson that "[t]he AUDI is still long. . . . Your AUDI should be less than 100."  (Doc. 45-8, p. 8).  Ms. Pujols suggested taking inventory of each specimen to show Ms. Metcalf where everything was.  (Doc. 45-8, p. 8).

On October 22, 2015, days before Ms. Henderson's 65th birthday, Ms. Metcalf issued Ms. Henderson a verbal warning. (Doc. 45-8, p. 2). According to the record of the warning, there were 28 reported lab accidents in the microbiology department in October 2015, for which 28 replacement samples had to be taken from patients; in September 2015, management learned of testing delays in more than a dozen samples; and an internal audit revealed that the department had not performed quality control on several reagents in 2014 and 2015. (Doc. 45-8, p. 2). The record of the verbal warning mentioned the AUDI, advising that "management is responsible for analyzing the AUDI reports to determine where to delegate personnel to eliminate overdue results." (Doc. 45-8, p. 2). The record of the warning concluded: "We have discussed this in the past; however[,] the problems still persists [sic]. Lack of compliance with LabCorp procedures or violations of any other policy may result in further disciplinary action up to and including termination of employment." (Doc. 45-8, p. 2).

On November 30, 2015, Ms. Pujols became Ms. Henderson's supervisor. Ms. Metcalf continued to supervise the rest of the Birmingham lab. (Doc. 45-11, p. 4, tp. 10; Doc. 45-7, p. 9, tp. 31). According to Ms. Henderson and Joyce Davidson, a laboratory supervisor in the microbiology department, Ms. Pujols was "disrespectful" of Ms. Henderson. (Doc. 45-7, p. 9, tp. 31; Doc. 45-3, p. 30, tp. 113). Ms. Davidson believed that Ms. Pujols singled out Ms. Henderson and used

profanity towards Ms. Henderson.  (Doc. 45-3, p. 30, tpp. 114–15).  Ms. Davidson
testified that Ms. Pujols "would come into Margaret's office and just start yelling
about stuff" using the words "'fuck,' 'shit,' a lot."  (Doc. 45-3, p. 30, tpp. 114–15).
In their private interactions, Ms. Pujols referred to Ms. Henderson as "her mentor"
and a "real southern lady."  Ms. Pujols also told Ms. Henderson, "I just hope to be
like you when I get to be your age."  (Doc. 45-7, p. 10, tpp. 33–34).  Ms. Henderson
testified that Ms. Pujols referred to Mr. Menendez as "daddy," saying things like,
"daddy's not happy with you today."  (Doc. 45-7, p. 51, tp. 199).

Satisfaction of Mr. Menendez's metrics for the Birmingham microbiology lab
was Ms. Pujols's priority.  In a December 1, 2015 email, Ms. Pujols responded to
Ms. Henderson's complaints about staffing deficiencies:  "Now is not the time to
argue that your style is better because [Birmingham] is not meeting the basic metrics.
Once we meet all the metrics we can go back to re-evaluate."  (Doc. 45-2, p. 4).  On
December 4, 2015, Ms. Pujols emailed Ms. Henderson in response to a
turn-around-time report for October 2015 that Mr. Menendez said was "not a good
report for Birmingham."  (Doc. 45-8, p. 12).  Ms. Pujols urged Ms. Henderson to
"come [up] with a solid mathematical plan to reach 95% in the Urine Bench by the
next TAT report. . . . You are at 85.11%, you need to figure out how to get to 95%."
(Doc. 45-8, p. 12).  On December 7, 2015, Ms. Pujols emailed Ms. Henderson to ask
about that day's AUDI report: "Margaret, what is your plan for the AUDI? Do not

wait until I ask you. You need to come up with a plan every day. It is your job to control your metrics." (Doc. 45-12, p. 9).

On January 7, 2016, Ms. Pujols issued Ms. Henderson a written warning. (Doc. 45-8, pp. 13–14). The warning recited the responsibilities of a Laboratory Manager II, noting that Ms. Henderson must, "ensure that your departments are issuing quality results and meeting all CAP requirements and regulatory guidelines, which include QC [quality control]." (Doc. 45-8, p. 13). The warning stated that Ms. Henderson's department had performed quality control "irregularly or not at all in some areas during the year 2015." (Doc. 45-8, p. 13). A December 2015 internal audit had revealed numerous areas of quality control for which there was no evidence of a supervisor review. (Doc. 45-8, p. 13). The written reprimand did not mention specific issues with the AUDI numbers. (Doc. 45-8, p. 13). Like the verbal warning a few months earlier, the written warning stated, "we have discussed this in the past; however[,] the problem persists," and warned that lack of compliance with Labcorp policies and procedures might result in termination. (Doc. 45-8, p. 13).

Microbiology Department supervisors Joyce Davidson and Hugo Millsap also received the verbal and written warnings. (Doc. 45-3, p. 17, tpp. 61–62; Doc. 45-4, p. 5). Following these warnings, Ms. Davidson stepped down from her supervisor role and returned to her former position as a technician. (Doc. 45-3, pp. 16–17, tpp. 60–62). In an email discussion with Ms. Henderson about finding Ms. Davidson's

replacement, Ms. Pujols stated: "Margaret, we can do this, we just have different management styles and I am trying to discover who are my warriors. I want active innovative people that [sic] are creative under pressure." (Doc. 45-2, p. 7). According to Ms. Henderson, Ms. Pujols said she wanted to fill the position with "someone that was a young Margaret," just like Ms. Henderson "but younger." (Doc. 45-7, p. 9, tp. 32).

Following the written reprimand, the AUDI numbers rose again in early February 2016. (Doc. 45-2, p. 19). On February 1, 2016, Ms. Pujols reached out to Ms. Henderson to ask for her plan to "clean up" that day's AUDI report. (Doc. 45-12, p. 10). Three days later, Theresa Burke, the Birmingham human resources manager, emailed Ms. Pujols seeking an explanation for the February 3, 2016 AUDI report, writing: "Numbers are higher than we have seen in a while." (Doc. 45-12, p. 11). Ms. Pujols reached out to Ms. Henderson again, urging her to "come up with a plan that controls the AUDI even if you have to do the bench yourself . . . The expectation for us is to control the AUDI no matter what." (Doc. 45-12, p. 11). Ms. Pujols responded to Ms. Burke that she "would like to tell [Ms. Henderson] that she will lose her employment with LabCorp if the AUDI spikes again . . .." (Doc. 45-2, p. 20). Rather than issuing this final warning, Ms. Pujols emailed Ms. Henderson on February 8, 2016 and requested an explanation for that day's AUDI exceeding

300 after being under control for months and stated, "we are reverting to incorrect behavior." (Doc. 45-2, p. 19).

On March 7, 2016, Mr. Menendez emailed Ms. Pujols, Ms. Metcalf, and Eric Dalebout (Ms. Pujol's direct supervisor in Tampa), seeking a detailed explanation for the AUDI numbers in the microbiology lab in Birmingham.  Mr. Menendez remarked that the numbers were "so bad" again.  (Doc. 45-10, p. 22).  Ms. Pujols sought an explanation from Ms. Henderson, asking her to "put a plan in place now where you can control the AUDI.  Do not let it go to 300." (Doc. 45-10, p. 22).  Ms. Henderson again attributed the struggles to staffing issues, specifically the need for weekend personnel, and asked Ms. Pujols to "[l]ook at the Thursday, Friday, Sat[urday] and Sun[day] evening AUDIs." (Doc. 45-10, p. 21).  Shortly thereafter, Ms. Pujols, at the direction of Mr. Menendez, began copying Ms. Burke on her communications with Ms. Henderson.  (Doc. 45-2, p. 8).

On April 11, 2016, the Monday morning AUDI report was above 600.  (Doc. 45-2, p. 11; Doc. 45-5, p. 10, tp. 35).  Billy Harbison, one of Ms. Henderson's laboratory supervisors, notified Ms. Henderson and Ms. Pujols that a weekend contract employee had run the wrong specimens.  (Doc. 45-6, p. 2; Doc. 45-10, pp. 23–28.).  The next day, Ms. Pujols submitted a recommendation for termination of Ms. Henderson.  (Doc. 45-10, p. 31).  The recommendation recounted each disciplinary event following the verbal warning and cited Ms. Pujols's numerous

conversations with Ms. Henderson about unacceptable AUDI reports.  (Doc. 45-10, p. 31).  The review stated that Ms. Henderson "has been unable to meet the AUDI requirements for the department."  (Doc. 45-10, p. 31).  In compliance with LabCorp's termination procedures, both LabCorp's divisional human resources director and Mr. Menendez approved the termination.  (Doc. 45-13, p. 5, ¶ 15; *see also* Doc. 45-2, pp. 21–22).

On April 13, 2016, Ms. Henderson was called into a meeting with Ms. Burke and Ms. Metcalf.  (Doc. 45-2, p. 9).  Ms. Pujols participated remotely by telephone.  (Doc. 45-1, p.18, tp. 68).  At the conclusion of the meeting, Ms. Henderson was discharged from her employment at LabCorp.  According to Ms. Pujols's notes from the meeting, she told Ms. Henderson, "Margaret you know we have been having issues with the AUDI since October of last year until now.  Margaret, you know and you understand that this impacts negatively our patients and our operation, Margaret you have not been able to correct the AUDI problem.  The decision has been made to terminate your employment."  (Doc. 45-2, p. 9).

After Ms. Henderson's termination, Ms. Pujols, age 48, filled Ms. Henderson's position in Birmingham and continued to manage the Tampa microbiology department.  (Doc. 45-13, p. 5, ¶ 16).  The microbiology department manager position was posted on May 9, 2016.  (Doc. 45-13, ¶ 16).  Under Ms. Pujols's management, the Birmingham microbiology department's AUDI reports

did not improve, and by June 2016, Ms. Pujols had drawn the ire of Mr. Menendez about the department's high numbers.  (Doc. 45-9, p. 27, 49, tpp. 103, 190).  In August 2016, more than one year after Ms. Henderson's termination, LabCorp hired Jennifer Clement, age 61, as a permanent replacement for Ms. Henderson.  Ms. Clement previously had served as a team leader under Ms. Pujols in the Tampa office.  Ms. Clement had 37 years of experience in microbiology and previous managerial experience.  (Doc. 45-13, p. 5, ¶ 16).  Ms. Pujols remained in a supervisory role over Ms. Clement until Ms. Pujols resigned in 2017.  (Doc. 45-11, p. 15, tp. 55).  Ms. Clement left LabCorp early in 2018.  (Doc. 45-1, pp. 22–23, tpp. 84–85; Doc. 45-9, p. 48, tp. 191).  According to Ms. Metcalf, the AUDI numbers did not improve under Ms. Clement, and Ms. Clement was reprimanded for the poor AUDI reports.  (Doc. 45-9, p. 49, tp. 191; Doc. 45-9, p. 50, tp. 193).

Following her termination, Ms. Henderson filed a claim for unemployment. In response to Ms. Henderson's claim, Ms. Burke provided a case summary on May 2, 2016 that listed Ms. Henderson's reason for separation as "involuntary-unsatisfactory work performance" and identified the final incident leading to termination as "[o]n 4/11/16 Microbiology had 600 pending specimens on the Audi report.  These are specimens that have not been tested/reported that should have been resulted [sic]."  (Doc. 45-2, pp. 10–11).  In response to a later request for additional information, Ms. Burke listed the reason for separation as

13

"involuntary-misconduct related performance" and explained that Ms. Henderson "did not staff her department to meet the needs of the testing schedule in order for all test [sic] to be performed, resulted." (Doc. 45-2, p. 12). On June 24, 2016, Ms. Henderson filed her formal charge of discrimination with the EEOC, alleging that her termination was based on her age and sex in violation of Title VII and the ADEA. (Doc. 45-8, pp. 37–38). In this action, Ms. Henderson is pursuing only her ADEA claim.

## ANALYSIS

The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)(1), prohibits employers from firing employees who are over 40 years old because of their age. *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). A plaintiff "cannot succeed unless the employee's age actually played a role in [the employer's decision-making] process *and had a determinative influence on the outcome*." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009) (emphasis in *Gross*). A plaintiff may use direct or circumstantial evidence to make such a showing. *Gross*, 557 U.S. at 177–78; *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 921–22 (11th Cir. 2018). When a plaintiff relies on circumstantial evidence, she either must satisfy the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or demonstrate that a "convincing mosaic" of circumstantial evidence warrants an inference of intentional

discrimination. *Lewis v. Union City, Ga.*, 918 F.3d 1213, 1218, 1220 n.6 (11th Cir. 2019) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff "will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory [or retaliatory] intent." *Smith*, 644 F.3d at 1328.

The *McDonnell Douglas* framework provides "a sensible, orderly way to evaluate [circumstantial] evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978). But the framework was "never intended to be rigid, mechanized, or ritualistic." *Furnco*, 438 U.S. at 577. Under the *McDonnell Douglas* framework, an ADEA plaintiff's *prima facie* case consists of proof that: "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Liebman*, 808 F.3d at 1298. If the plaintiff establishes his *prima facie* case, then he creates a presumption of unlawful discrimination. *Liebman*, 808 F.3d at 1298. "A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco*, 438 U.S. at 577. If a plaintiff offers sufficient evidence to create a presumption of

discrimination, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Lewis*, 918 F.3d at 1221 (citing *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant carries its burden, then the presumption of discrimination is rebutted, and the plaintiff "must demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination.'" *Lewis*, 918 F.3d at 1221 (quoting *Burdine*, 450 U.S. at 256).

"[T]he *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328 (reversing the district court's grant of summary judgment because sufficient circumstantial evidence of discrimination existed apart from the district court's *McDonnell Douglas* analysis). When a plaintiff attempts to establish discriminatory intent by assembling a convincing mosaic of circumstantial evidence, the plaintiff may present "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. Union City, Ga.*, 934

16

F.3d 1169, 1185 (11th Cir. 2019) (on remand to panel on plaintiff's "convincing mosaic" theory of liability) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)).   No matter the form of circumstantial evidence that a plaintiff presents, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper."  *Smith*, 644 F.3d at 1328.[1]

Here, Ms. Henderson's bits and pieces of circumstantial evidence do not raise a reasonable inference that LabCorp discriminated against her based on her age or that her age "had a determinative influence" on LabCorp's decision to terminate her employment.  *See Liebman*, 808 F.3d at 1298 ("[A]n employee must establish that her age was the 'but for' cause of the adverse employment action.") (citing *Gross*, 557 U.S. at 176).

Ms. Henderson argues first that LabCorp retained Ms. Pujols and Ms. Clement even though the AUDI numbers for the microbiology department at the Birmingham

---

[1] In its brief in support of its motion for summary judgment, LabCorp argues that Ms. Henderson has not presented direct evidence of discriminatory intent.  (Doc. 47, pp. 11–15).  In her brief in opposition to LabCorp's motion, Ms. Henderson does not argue otherwise, so the Court considers the age-related comments in the record in its assessment of the circumstantial evidence in this case. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) ("[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.").   Direct evidence of discrimination overcomes a motion for summary judgment in an ADEA case.  *Mora v. Jackson Mem. Found.*, 597 F.3d 1201, 1204 (11th Cir. 2010).

lab did not improve under their supervision.  In other words, she contends that LabCorp's retention of Ms. Pujols and Ms. Clement is circumstantial evidence of systematically better treatment of similarly situated employees at LabCorp.  *Lewis*, 934 F.3d at 1185.  Comparator evidence may be probative of pretext and may serve as a piece of a convincing mosaic of circumstantial evidence of discriminatory intent.  *Lewis*, 918 F.3d at 1223, n.9 ("Evidence necessary and proper to support a plaintiff's *prima facie* case may of course be used, later as it were, to demonstrate that the defendant's explanation for its conduct was pretextual.") (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, (2000)).[2]

---

[2] LabCorp argues that neither Ms. Pujols nor Ms. Clement satisfies the comparator standard that applies at the *prima facie* stage of the *McDonald Douglas* framework.  (Doc. 52, pp. 2–4). LabCorp's argument is not persuasive for several reasons. First, in *Lewis*, the Eleventh Circuit superseded the authority on which LabCorp relies. (Doc. 52, pp. 3-4) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir. 1999)).  Second, a plaintiff's proposed comparators do not have to meet the *Lewis prima facie* comparator standard if the plaintiff offers comparator evidence to prove pretext or a convincing mosaic of circumstantial evidence.  In *Lewis*, the Eleventh Circuit found that a plaintiff relying on comparator evidence to establish a *prima facie* case of discrimination under *McDonnell Douglas* must show that the plaintiff and his comparator were "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218.  The Eleventh Circuit locked the "similarly situated in all material respects" analysis into the *prima facie* case stage because the purpose of the *prima facie* case is to "give rise to a valid inference that [the plaintiff's] employer engaged in unlawful intentional 'discrimination.'"  *Lewis*, 918 F.3d at 1222.  And the Eleventh Circuit found that "it is only by demonstrating that her employer has treated 'like' employees 'differently'—*i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination*."  *Lewis*, 918 F.3d at 1223 (emphasis in original).  As noted, the Eleventh Circuit expressly held that a plaintiff still may use comparator evidence at the pretext stage to create an inference of discriminatory intent.  Third, and most importantly, *Maniccia* and *Lewis* are Title VII cases, and the comparator element of a plaintiff's ADEA *prima facie* case differs from the comparator element of a plaintiff's Title VII *prima facie* case in that, as stated earlier, to establish a *prima facie* case under the ADEA, a plaintiff need only show that her employer replaced her with a substantially younger person.  *Liebman*, 808 F.3d at 1298–99.

At first blush, LabCorp's seemingly disparate treatment of Ms. Pujols and Ms. Clement when each failed to meet Mr. Menendez's AUDI standards may seem promising for Ms. Henderson, but a closer examination of the evidence diminishes its impact as evidence of discriminatory intent.[3]  It is undisputed that Ms. Henderson, Ms. Pujols, and Ms. Clement all failed to meet Mr. Menendez's demanding

---

For purposes of this summary judgment opinion, because neither party has properly analyzed the issue, the Court assumes that Ms. Henderson can establish a *prima facie* case of age discrimination. It is a safe assumption because Ms. Henderson has demonstrated that LabCorp initially installed Ms. Pujols as manager of the Birmingham microbiology department.  At age 48, Ms. Pujols was substantially younger than Ms. Henderson, age 65.  *Liebman*, 808 F.3d at 1298–99 ((holding that seven-year age difference "qualifies as substantially younger" even though the comparator is over the age of 40).  That Ms. Pujols held the Birmingham position only temporarily from April 2016 to August 2017 does not mean she cannot be considered a comparator.  *See Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1280 (M.D. Ala. 2011) (citing *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 2318 (6th Cir. 2007) ("[M]erely designating the new hire 'temporary' will not defeat the fourth element" of a *prima facie* case of age discrimination.).

LabCorp has articulated a legitimate, non-discriminatory reason for its employment decision.  This burden of production is "exceedingly light."  *Conner v. Ford Gordon Bus Co.,* 761 F.2d 1495, 1499 (11th Cir. 1985).  LabCorp asserts that Ms. Henderson was terminated for her poor performance over multiple years in violation of LabCorp's policies, procedures, and guidelines. LabCorp has provided numerous specific reasons for Ms. Henderson's termination—poor scheduling of staff, failure to meet the AUDI requirements, and unsatisfactory work performance. (Doc 45-10, pp. 47, 31, 45).  Accordingly, LabCorp has met its burden to produce a legitimate, nondiscriminatory reason for Ms. Henderson's termination.  Therefore, the Court must examine Ms. Henderson's circumstantial evidence of pretext and discriminatory intent.

[3] There is contradictory evidence regarding the AUDI results for the microbiology department in Birmingham after Ms. Henderson's termination.  Billy Harbison testified that the AUDI did not exceed 200 in the Birmingham microbiology department after Ms. Pujols took over.  (Doc. 45-5, p. 12, tp. 43).  Ms. Pujols testified that Ms. Clement "controlled [the AUDI] for a long time." (Doc. 45-11, p. 15, tp. 55).  Viewing the evidence in the light most favorable to Ms. Henderson the Court accepts Ms. Metcalf's testimony that both successors struggled to control the AUDI. Ms. Metcalf testified that when the AUDI was high under Ms. Pujol's management, Ms. Pujols would catch heat from Rudy Menendez on the weekly calls.  (Doc. 45-9, p. 27, tp. 103.  Likewise, Ms. Metcalf testified that she heard Ms. Clement being reprimanded for having high AUDI numbers.  (Doc. 45-9, p. 49, tp. 193).

productivity standards for the Birmingham microbiology department, and LabCorp terminated only Ms. Henderson. But LabCorp removed Ms. Pujols as manager of the Birmingham microbiology department. LabCorp did not terminate Ms. Pujols because while she managed the Birmingham microbiology lab, she had maintained her assignment as manager of LabCorp's microbiology department in the Tampa lab, and she continued her work in Tampa after she relinquished the Birmingham microbiology department to Ms. Clement. There is no evidence that LabCorp's microbiology department in Tampa did not meet AUDI standards. To the contrary, Mr. Menendez asked Ms. Pujols to coach Ms. Henderson because the Tampa lab performed well by the AUDI metrics.

As for Ms. Clement, the record reflects that after she took the reins as manager of the Birmingham lab in August 2017, she was reprimanded for the poor AUDI reports. (Doc. 45-9, p. 49, tp. 191; Doc. 45-9, p. 50, tp. 193). Ms. Clement left LabCorp early in 2018. (Doc. 45-1, pp. 22–23, tpp. 84–85). The evidence surrounding Ms. Clement's departure is somewhat inconsistent, but her brief tenure indicates that she understood that she would not be able to meet LabCorp's production demands for the Birmingham microbiology department. (Doc. 45-1, pp. 22–23, tpp. 84–85) (Ms. Burke's testimony that she learned that Ms. Clement resigned voluntarily by "an email in the middle of the night"); (Doc. 45-9, p. 48, tp.

191) (Ms. Metcalf's testimony that Ms. Clement "didn't improve either, and she's gone.").

Ms. Henderson argues that LabCorp set her up to fail by assigning unattainable AUDI metrics and using her failure to meet those lofty standards as grounds for her termination. For several reasons, reasonable jurors could not infer from the demanding AUDI goals for the Birmingham microbiology lab an effort by LabCorp to discriminate against Ms. Henderson because of her age.

First, as Ms. Henderson points out, LabCorp applied those standards not only to her but also to Ms. Pujols and Ms. Clement. Had LabCorp used one standard for Ms. Henderson and another for Ms. Pujols and Ms. Clement, Ms. Henderson's argument about unattainable AUDI goals might gain some traction, but LabCorp's uniform treatment of three managers of the Birmingham microbiology department undermines an inference of discriminatory intent.

Second, Ms. Henderson struggled to meet production goals for the microbiology department well before LabCorp began using AUDI as a performance metric in 2015. In 2014, Ms. Henderson received a PIP that focused on the department's use of overtime. (Doc. 45-8, p. 9). In September of 2014, the department had ranked fifth in productivity with a 14.3% OT rate. (Doc. 45-8, p. 9). The PIP indicated that OT rates for the microbiology department were consistently high regardless of the number of full-time employees in the department and

attributed the OT rates to mismanagement of resources.  (Doc. 45-8, p. 9).  Ms. Henderson's mismanagement of resources in her department underlies each of the warnings she received leading up to her termination.  Thus, her failure to meet the AUDI metric was only part of, and indicative of, an overall pattern of managerial deficiencies.[4]

And the AUDI rates for the Birmingham microbiology lab were not random numbers that LabCorp pulled from thin air.  The AUDI measured the number of

---

[4] In the eighteen months leading to her termination, Ms. Henderson received informal and formal correction to address deficient performance and policy violations.  In addition to the PIP, Ms. Henderson received a verbal warning in October 2015 for her violations of LabCorp policy; namely, 28 reported lab accidents, failure to timely forward samples for testing, and failure to adequately perform quality control on several reagents for two years.  In January 2016, Ms. Henderson received a written warning, taking her to task for her department's failure to regularly perform quality control.  Each warning indicated that despite prior discussions, "the problem persists" and stated that future noncompliance with LabCorp policies and procedures could result in termination.  (Doc. 45-8, pp. 2, 3, 13).  Ms. Henderson's department routinely fell short of various performance metrics, and in February and March of 2016, Ms. Pujols reprimanded Ms. Henderson by email for allowing the AUDI to spike.  (Doc. 45-2, p. 4; Doc. 45-2, p. 19; Doc. 45-10, p. 22).  After the AUDI spiked to over 600 on April 11, 2016, LabCorp terminated Ms. Henderson.

Ms. Henderson characterizes LabCorp's recitation of non-AUDI performance deficiencies as "inconsistent" because Ms. Pujols specifically discussed the AUDI in terminating Ms. Henderson's employment.  (Doc. 51, pp. 12–13).  But these performance issues are consistent in every meaningful way.  This is not a situation in which Ms. Henderson's employer verbally told her that her AUDI scores were the basis for her termination and then wrote in a report, for example, that she was being terminated for absenteeism.  *Compare Fulmer v. PCH Hotels & Resorts, Inc.*, 2020 WL 1929406, *12 (N.D. Ala. April 21, 2020) (discussing three alternative explanations for plaintiff's termination).  An employer may provide additional, consistent reasons for an adverse employment decision without suggesting pretext.  *Ritchie v. Industrial Steel, Inc.*, 426 Fed. Appx. 867, 872 (11th Cir. 2011).  Where a string of performance deficiencies and violations of company policy leads to a series of corrective actions culminating in termination, it is not inconsistent for the employer to identify one, but not all, of the violations as the stated basis for dismissal.  Consistency does not require an employer to recite in full an employee's disciplinary history in a dismissal meeting nor does it bind the employer to only that given reason going forward.  LabCorp's additional, consistent reasons do not suggest pretext or discriminatory animus.

specimens taken from potentially ill patients that were at least 24 hours overdue for testing, according to standard operating procedure. (Doc. 45-7, pp. 24–25, tpp. 92–94; Doc. 45-9, p. 27, tp. 104). Such delays, Ms. Metcalf testified, could result in "patients who are not treated or the physician does not have the adequate information to ensure . . . they've prescribed the right antibiotic." (Doc. 45-9, pp. 27–28, tpp. 104–05). As a lab manager overseeing the microbiology department, Ms. Henderson was, as her verbal warning indicated, "responsible for analyzing the AUDI reports to determine where to delegate personnel to eliminate overdue results." (Doc. 45-8, p. 2; Doc. 45-7, p. 12, tpp. 42–43).

In challenging LabCorp's reliance on her AUDI scores as a basis for her termination, Ms. Henderson continues to attribute those scores to LabCorp's staffing decisions rather than her management efforts. Ultimately, the explanation for the AUDI scores does not matter because Ms. Henderson cannot demonstrate pretext by quarreling with the wisdom of LabCorp's staffing decisions. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010).

Ms. Henderson contends that jurors could infer discriminatory intent from the timing of her first verbal warning. That warning occurred just before her 65th birthday and months after she received a positive performance evaluation. According to Ms. Henderson, it was well-known at LabCorp that she intended to retire at the age of 70. (Doc. 45-7, p. 11, tp. 37). Evidence of positive performance

23

reviews and suspicious timing may serve as circumstantial evidence of pretext where the favorable evaluations seem to undermine the employer's rationale for firing the employee. *See Clymer v. Caterpillar, Inc.*, 2011 WL 13217001, at *11 (S.D. Fla. Aug. 24, 2011) (finding evidence of pretext where supervisor's performance reviews of plaintiff were "in stark contrast" to his deposition testimony and "diametrically opposite" of the employer's proffered grounds for terminating plaintiff).

Here, context undermines Ms. Henderson's argument. As discussed, LabCorp placed Ms. Henderson on a PIP in November 2014 for mismanaging her department's resources.[5]  Thus, the verbal warning that Ms. Henderson received a few weeks before her 65th birthday was not her first company discipline.  In context, the favorable June 2015 review suggests that the PIP helped Ms. Henderson for several months, but she was not able to maintain her positive momentum long enough to achieve sustained success in her department.  Thus, the October 2015 verbal warning is not the type of anomalous discipline (often dispensed by a new supervisor) that may support an inference of discriminatory intent. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999); *compare Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002) (finding no evidence of

---

[5] The PIP followed several years of winnowing the departments under Ms. Henderson's supervision.

discrimination where bad evaluation was supported by reports from other employees and lab complaints, and the employee did not dispute the performance problems).

Finally, Ms. Henderson contends that Ms. Pujol's age-related statements and disrespectful treatment of her are evidence of LabCorp's discriminatory animus based on age.   A co-employee's discriminatory statements may constitute circumstantial evidence of an employer's discriminatory intent. *Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729–30 (11th Cir. 1999).   But the substance, timing, and context of such comments is important to determining the strength of any inference that may be drawn from the remarks. *Damon*, 196 F.3d at 1362–63.   "[S]tray remarks that are isolated and unrelated to the challenged employment action" generally are insufficient to prove discriminatory intent. *Ritchie v. Industrial Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011).   Comments made by a decision-maker directed at a particular employee and related to the employment issue at hand warrant a stronger inference than stray remarks unrelated to the employee or employment decision.

Ms. Henderson argues that at some point, but not at the time of her termination or of any discipline,[6] Ms. Pujols made age-based remarks about her.[7]   Ms. Pujols's

---

[6] It is not clear when some of the allegedly ageist comments were made.  In her complaint, Ms. Henderson alleges that Ms. Pujols said "I am looking for a younger you" in January 2016 and said "I hope I am like you when I get to be your age" in December 2015.  (Doc. 1, p. 4, ¶ 18).  Both Ms. Henderson's complaint and the evidence are silent about the timing of the other comments.

[7] Ms. Henderson also alleges that Ms. Pujols referred to Mr. Menendez as "Daddy," which Ms. Pujols denies.  (Doc. 45-7, p. 51, tp. 199).  Although Ms. Henderson testified that Mr. Menendez never made ageist comments towards her, she argues this is direct evidence of Mr. Menendez's preference for working with younger women.  (Doc. 45-7, p. 9,

descriptions of Ms. Henderson as a "mentor" and a "southern lady" are, at best, tenuously connected to age.  Ms. Pujol's statement that she "hoped to be like [Ms. Henderson] when [she] got to be [her] age" is unrelated to Ms. Henderson's termination.   While age-related, Ms. Pujol's statement that she hoped "to find someone that was a young Margaret" to fill an open position was not related to Ms. Henderson's termination or discipline, but rather said in the context of finding a supervisor to work under Ms. Henderson months prior to Ms. Henderson's termination.  The statements that directly implicate Ms. Henderson's age are bits of circumstantial evidence, but, viewed in the context of the complete evidentiary record, the statements do not establish a convincing mosaic of circumstantial evidence of age discrimination.[8]

Ms. Henderson also identifies as discriminatory an email in which Ms.  Pujols stated she was "trying to discover who are my warriors.  I want active innovative people that are creative under pressure." (Doc. 45-10, p. 18).  Ms. Henderson infers from this email, sent as part of a discussion about one of her lab supervisors, that

---

tp. 31; Doc. 51, p. 13).  There is no evidence that Mr. Menendez knew of or condoned the nickname.  Accordingly, Ms. Pujols's alleged comment cannot be imputed to Mr. Menendez to infer discriminatory animus.

[8] Viewed in its entirety, the evidence suggests that Ms. Pujols chose her words poorly and peppered her remarks with foul language.  Ms. Davidson testified that Ms. Pujols would use profanity when talking to Ms. Henderson and "come into Margaret's office and just start yelling about stuff."  (Doc. 45-3, pp. 15, 30, tpp. 54, 115).  But, Ms. Davidson testified that while Ms. Pujols treated Ms. Henderson disrespectfully," she (Ms. Davidson) "[didn't] think it had anything to do with age."  (Doc. 45-3, p. 30, tp. 113).  Ms. Henderson does not point to other evidence in the record that ties Ms. Pujols disrespectful treatment of Ms. Henderson to age-based animus.  The record contains little evidence that ties Ms. Pujols's unprofessional language to LabCorp such that jurors could infer from Ms. Pujols's language that LabCorp intentionally discriminated against Ms. Henderson.

Ms. Pujols held discriminatory animus towards Ms. Henderson based on her age. The context of this comment undercuts an inference of discrimination.

Since 2011, LabCorp had placed an emphasis on metrics. The record demonstrates the microbiology department in 2015 and 2016 struggled to meet the metrics. Ms. Henderson repeatedly acknowledged these deficiencies and attributed them to understaffing and the constant loss of employees to other labs. (Doc. 45-10, pp. 1–10). Both of Ms. Henderson's supervisors, Ms. Pujols—whom Ms. Henderson accuses of discriminatory animus—and Ms. Metcalf—whom she does not—counseled Ms. Henderson to change her management style to be more efficient with fewer staff members. (Doc. 45-9, p. 6, tp. 20; Doc. 45-11, p. 11, tpp. 37–38). Ms. Henderson persistently attributed the microbiology department's struggles to understaffing. (Doc. 45-10, pp. 1–10). Ms. Pujols's desire for innovative people who might increase the department's efficiency is logical. There is nothing discriminatory in the term "innovative" itself—people of any age can be innovative—, and Ms. Henderson offers no context that adds to the term an ageist slant.

Ms. Henderson has compiled circumstantial evidence that may prove to a jury that LabCorp was unfair or unkind in its treatment of her or unwise in its reliance on the AUDI, but she has not demonstrated that LabCorp's articulated non-discriminatory reason for her termination, specifically Ms. Henderson's

managerial performance failures, is pretext for age-based discrimination.  Thus, Ms. Henderson has not identified circumstantial evidence from which jurors reasonably could infer that age-based discrimination was the but-for cause of her termination. *See Howard v. Hyundai Motor Mfg. Alabama*, 754 Fed. Appx. 798, 808 (11th Cir. 2018) (An employer "cannot be held liable for discriminatory conduct ... [when the plaintiff] fail[s] to point to any evidence that unlawful discriminatory animus actually motivated [the] actions."); *see also Williams v. Fla. Atl. Univ.*, 728 Fed. Appx. 996, 999 (11th Cir. 2018) ("In the end, an 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'") (quoting *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984), abrogated on other grounds by *Lewis*, 918 F.3d 1213).

## CONCLUSION

For the reasons stated above, the Court will enter judgment in favor of LabCorp with respect to Ms. Henderson's ADEA claim.  The Court will enter a separate order of final judgment consistent with this memorandum opinion.

The recent General Order Regarding Court Operations During the Public Health Emergency Caused by the COVID-19 Virus (N.D. Ala. Mar. 17, 2020) does not affect the deadline to challenge a final order or judgment on appeal.  *See*

https://www.alnd.uscourts.gov/general-order-regarding-court-operations-during-public-health-emergency-caused-covid-19-virus, p. 2, ¶ 7.  The parties are reminded that under Rule 4(a)(5) of the Federal Rules of Appellate Procedure, a party may request an extension of time for a notice of appeal.  In addition, pursuant to Rule 4(a)(6), a party may ask a district court to reopen the time to file a notice of appeal for 14 days.  Parties are advised to study these rules carefully if exigent circumstances created by the COVID-19 Public Health Emergency require motions under FRAP 4(a)(5) or 4(a)(6).

**DONE** and **ORDERED** this May 14, 2020.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

29